IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

David Taylor,

    Petitioner,

v.                            Case No. 4:07-cr-00105

United States of America,

    Respondent.
_____/

## EMERGENCY MOTION FOR COMPASSIONATE RELEASE
## PURSUANT TO § 3582

    COMES NOW, David Taylor, Petitioner/Defendant, proceeding pro se, and moves this Court to grant his compassionate release based upon the extraordinary and compelling reasons of his particularlized risk of severe complications and death from COVID-19 due to his serious health problems, his particularized risk of contracting COVID-19 in the BOP, and specifically at FCI-Milan, and other factors that favor his reduction in federal sentence.

### JURISDICTION/STANDARDS

1. There exist four prerequisites to a court's granting compassionate release under the First Step Act of 2018. First, the defendant must have exhausted his administrative rights with the BOP. Second, the defendant must demonstrate that "extraordinary and compelling reasons" warrant release. Third, the court must determine that the defendant is not a danger to society, or that any residual dangerousness is mitigated by conditions of release. And fourth, the court must weigh the factors set forth in § 3553(a). See § 3582(c)(1)(A).

2. Among the changes in the law created by the First Step Act, Congress amended the provision on compassionate release, 18 U.S.C. § 3582(c)(1)(A)(i). Prior

-1-

to this amendment, only the BOP Director had the authority to file a motion for compassionate release. The newly amended law provides the sentencing judge with jurisdiction to consider a defense motion for reduction in sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the Warden of the defendant's facility, whichever is earlier[.]" § 3582(c)(1)(A).

3. In order to determine if extraordinary and compelling reasons exist to release the Petitioner, the Court may determine if a sentence reduction is "consistent with the applicable policy statement issued by the Sentencing Commission." § 3582(c)(1)(A). The relevent portions of the applicable policy statement read as follows:

> 1. Extraordinary and Compelling Reasons.-- Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set below:
>
> (A) Medical Condition of the Defendant.--
>
> (i) The defendant is suffering from a terminal illness [...]
>
> (ii) The defendant is--
>
> (I) suffering from a <u>serious physical or medical condition</u>,
>
> (II) suffering from serious cognitive or mental impairment, or
>
> (III) experiencing deteriorating physical and mental health because of the aging process, [...]
> [...]
> (D) <u>Other Reasons.-- As determined by the Director of the [BOP]</u>, there exists in the defendant's case an extraordinary and compelling reason <u>other than, or in combination with</u>, the reasons described in subdivisions (A) through (C). U.S.S.G. § 1B1.13 Note 1 (emphasis added)

## DISCUSSION / ARGUMENT

### I. PETITIONER HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES

On 12/01/2020, the Petitioner submitted an application for Compassionate Release to Warden Hemingway of FCI-Milan via the TRULINCS electronic portal, as per FCI-Milan policy. See ATTACHMENT 1. Warden Hemingway failed to reply within 30 days, conferring jurisdiction to this Court.

2. The Bureau of Prisons, and specifically FCI-Milan where the Petitioner is housed, have demonstrated that they are unable and perhaps unwilling, to protect the Petitioner, or any other inmate, from contracting COVID-19.

   a) The COVID-19 crisis continues to rage across America unchecked. By early December, new cases were regularly topping 150,000 a day, with COVID-19 deaths exceeding 2000 per day, and things are only expected to worsen. The University of Washington's Institute for Health Metrics predicts "Cumulative deaths expected by April 1, are 540,000," even taking into account a vaccine.

   There is no doubt that some of those additional deaths will be in the BOP. The BOP has implemented a detailed plan to slow deaths within their facilities, but it has fallen far short. The BOP's plan <u>does not require prison staff to wear masks.</u>[9] <u>Current policy also directs COVID-positive prison staff who are asymptomatic to return to work.</u>[9] Of course, both of these policies fly in the face of plain common sense, unequivocal scientific evidence, and clearly stated CDC recommendations. See, "When to Quarantine," CDC;[10] and "CDC Calls on Americans to Wear Masks to Prevent COVID-19 Spread," CDC.[11]

   Perhaps this partly explains why the COVID-19 infection rate in the BOP is <u>five-times</u> that of the general U.S. population, with a similarly disproportionate death rate. ATTACHMENT 2 (New York Federal Defenders). Regardless, Congress, the Department of Justice, the union representing prison workers, and experts in correctional medicine all recognize that the BOP has not created a safe place to be during a pandemic. See, CARES Act Home Confinement Provisions; Memos from Attorney General to the Director of the Bureau of Prisons directing the BOP to release qualified prisoners;[12] "Imminent Danger" complaint to OSHA from prison staff detailing the BOP's failure to follow national safety guidelines;[13] and "Infection Control in Jails and Prisons," CLINICAL INFECTIOUS DISEASE.[14]

And the BOP COVID-19 infection rate continues to climb, despite the continued lack of universal testing. Through the first 3 weeks of November, the BOP reported a 51% increase in the number of infected inmates, registering a double digit increase every week.[15]

b) FCI-Milan is no exception. In fact, FCI-Milan has had more inmate deaths, confirmed inmate infections, and confirmed staff infections than the majority of BOP facilities.[11] And these "official" numbers are likely a significant undercount of actual infections, because the BOP policy remains to only test symptomatic inmates. Of course, government prosecutors love to quote these artificially low numbers and point to them as evidence of the impeccable job that the BOP is doing to thwart the pandemic against all odds. But most federal courts aren't fooled. See, e.g., Re: Manrique, 2020 WL 1307109, at 1 (N.D. Cal. Mar. 2020) ("The Bureau of Prisons management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch-up... We don't know who's infected.") (emphasis added); "Although the facility only has five active cases among its inmate population... the fact that prisoners are only tested for the virus if they [admit] symptoms suggests that the number may in reality be much higher." United States v. Oliver, 2020 U.S. Dist. LEXIS 92839, at 17 (E.D. Mich. May 28, 2020) (referring to FCI-Milan); "Zero confirmed COVID-19 cases is not the same thing as zero COVID-19 cases." United States v. Amarrah, 2020 U.S. Dist. LEXIS 80396, at 6 (E.D. Mich. May 7, 2020) (discussing how the lack of universal testing leads to inaccurately low numbers) (some emphasis original).

This lack of effort to determine actual case numbers is an inherent problem that undermines the entire BOP plan to curb the virus.

c) The U.S. Attorney's response to this motion will likely contain significantly outdated information describing the BOP's coronavirus lockdown procedures. However, currently, as of the drafting of this Motion, FCI-Milan is open for business. Busses are bringing in inmates from around the country every week, contractors and volunteers from the community are onsite, and social visiting is open 4 days a week (which is actually 2 days more per week than before the pandemic). Work details and programming that mix inmates from different housing units, and even allow inmates to go out into the community and then return ("gate pass") are ongoing. Meanwhile, the surrounding community is setting new records for infections and deaths, and the state is implementing tighter restrictions. Despite this, FCI-Milan continues to operate without additional precautions.

d) And no matter the efforts of the BOP, the infrastructure of the nearly 90 year old FCI-Milan cannot be meaningfully altered. Even Warden Hemingway admits in a now deleted memo that "social distancing of 6 feet cannot be achieved" at FCI-Milan. ATTACHMENT 3. Mr. Taylor lives in H-Unit along with about 200 other men who all share 1 ice machine scoop, 2 drinking fountains, 2 hot water stations, 4 phones, 10 computers, and numerous high-touch surfaces. None of these things are cleaned more than once per day. Mr. Taylor has been provided hand soap, toilet tissue, a broom, and a dustpan to "sanitize" his living area. He works in the prison factory where mask wearing is not enforced, and he is in contact with hundreds of inmates from all different housing units... a daily super-spreader event. He's only allowed to do laundry once per week despite being allocated only 4 sets of clothes. And, if things work out well, he gets clean bed linen once every other week. In short, the "self-care" required to protect himself from coronavirus is simply impossible.

e) Following BOP guidance, FCI-Milan, designated a special housing unit for inmates that it determined were high risk for COVID-19. "According to the government, the procedures in the special housing unit, which are described in its motion response as follows, have <u>substantially mitigated or eliminated the risk</u> to [the defendant's] health: 'In mid-April 2020, inmates at FCI-Milan who were identified as being potentially at risk for COVID-19 by Health Services were assigned to live in C-Unit. The <u>entire purpose</u> of C-Unit is to mitigate possible exposure for these at risk inmates...'" <u>United States v. Nazzal</u>, 2020 U.S. Dist. LEXIS 101391 at 4 (E.D. Mich. June 10, 2020) (quoting government's motion response)(emphasis added).

Thus, C-Unit was FCI-Milan's pinnacle of COVID-19 response that should be envied and copied throughout the BOP. <u>However</u>, on June 19, 2020, all inmates in C-Unit were tested for COVID-19 (no other units were tested), and despite FCI-Milan's assertion that they had "substantially mitigated or eliminated" their risk, <u>13 of 45 inmates tested positive</u>. This incident was referred to by another Court in its decision granting compassionate release to a sex offender defendant from FCI-Milan: "As evidenced by the recent infections among the prisoners in a high-risk population, the risk of contracting COVID-19 in FCI Milan remains a daily threat, and that is entirely out of [the defendant's] control." <u>United States v. Kirschner</u>, 2020 U.S. Dist. LEXIS 124496 (S.D. Ind. July 15, 2020) at 9. Perhaps this occurred because the BOP officers that worked in C-Unit came from homes in the community everyday and didn't wear masks. Regardless, instead of increasing precautions in C-Unit, FCI-Milan emptied C-Unit, dispersing all of the high risk inmates into the general population, including into the open dormitory units, <u>without retesting them before they were moved</u>.

f) Perhaps those C-Unit correctional officers wanted to wear masks but weren't provided one. In a Union complaint, FCI-Milan correctional officer Randy

-10-

Hall reported that a fellow FCI-Milan staff member who was escorting a symptomatic prisoner to the hospital was denied a mask or other PPE. Upon testing, the prisoner was positive for COVID-19 (and later died), and ultimately the officer himself became infected and ended up in the ICU on a ventilator. But Officer Hall's primary complaint was that he (Hall) was <u>ordered back to work at FCI-Milan right after testing positive for COVID-19</u>. ATTACHMENT As we saw above, such a return to work despite being positive for COVID-19 is <u>still</u> official BOP policy.

g) Importantly, both the U.S. District Court and the U.S. Attorney's Office in the federal district local to FCI-Milan (Eastern District of Michigan), and courts across the country, have all recognized that, despite the BOP's best efforts, COVID-19 is a true threat to the prisoners of FCI-Milan. "Here [Defendant] has presented sufficient evidence that FCI Milan is a high risk facility for contracting COVID-19." <u>United States v. Wilson</u>, 2020 U.S. Dist. LEXIS 132468 at 11 (S.D. W.Va. July 27, 2020); "There is a current COVID-19 outbreak at FCI Milan, a facility which is not conducive to social distancing." <u>United States v. Berry</u>, 2020 U.S. Dist. LEXIS 123947, at 5-6 (E.D. Wis. July 15, 2020); "Continuing to incarcerate Defendant in an enclosed environment while the virus runs rampant, is a potentially deadly decision." <u>United States v. Crider</u>, 2020 U.S. Dist. LEXIS 133233, at 8 (E.D. Mich. July 28, 2020); (referring to FCI-Milan); "The government itself concedes that FCI-Milan 'has experienced a major outbreak of COVID-19.'" <u>United States v. Pomante</u>, 2020 U.S. Dist. LEXIS 85626, at 15 (E.D. Mich. May 15, 2020). "Even if the Court were to accept the argument that BOP and FCI Milan are taking precautions to ensure the safety of prisoners, the defendant's risk of contracting COVID-19 is not speculative." <u>United States v. Saad</u>, 2020 U.S. Dist. LEXIS 74949 (E.D. Mich.). As of 09/18/2020, the most recent BOP LEXIS update for prisoners, at least 10 FCI-Milan inmates have been granted compassionate release by

-11-

the local District Court, and many more by other courts across the country. ATTACHMENT 5.

h) FCI-Milan continues to hold compound-wide gaming tournaments for various card and board games, completely disregarding social-distancing recommendations, and encouraging vulnerable prisoners to do the same. ATTACHMENT 6. Also, on August 26, 2020, FCI-Milan restarted random breathalizer testing of inmates waiting in line for meals (well within 6 feet of each other), <u>without</u> sanitizing the breathalizer device between inmates.

Time and again, Warden Hemingway and the other FCI-Milan administrators have demonstrated that they "just don't get it" when it comes to protecting inmates and staff, and it's not clear that they ever will.

i) Sadly illustrating this point, the active case count at FCI-Milan has gone from 1 to over 70 in less than 2 weeks (ending December 11).[15] Despite this relative explosion of cases, FCI-Milan has taken <u>no</u> new precautions to stop the spread. None.

j) Given (1) Mr. Taylor's serious health conditions, (2) his inability to practice social distancing, proper sanitation, and other CDC-recommended precautions at FCI-Milan, and (3) the demonstrated failure of the BOP and FCI-Milan to slow the spread of COVID-19, this Court should find that Mr. Taylor's circumstances are sufficiently extraordinary and compelling to warrant granting compassionate release.

-12-

## III. MR. TAYLOR NO LONGER REPRESENTS A DANGER TO SOCIETY

### 1. The BOP itself has determined that Mr. Taylor is not a danger to society.

a) The Court need look no further than the fact that the government itself has determined that, if released today, Mr. Taylor has a LOW risk of recidivating. This was determined using the Prisoner Assessment Tool Targeting Estimated Risks and Needs ("PATTERN"). According to the government, this personalized and evidence-based "risk and needs assessment system is used to determine the risk and needs of inmates in BOP custody. Specifically, the system determines the recidivism risk of each inmate and assigns them a recidivism score." FEDERAL BUREAU OF PRISONS.[16] ATTACHMENT 7.

b) This score was calculated by Mr. Taylor's case manager, a person who knows Mr. Taylor well and has closely followed his rehabilitation efforts and prison conduct. This is in contrast to the government's prosecutors, who have never met Mr. Taylor, but are likely to try to argue his dangerousness based solely on his past conduct.

### 2. Mr. Taylor is asking to be released to Home Confinement

a) This Court has the authority to mitigate any remaining risk to the community posed by releasing Mr. Taylor early by altering his current terms and conditions of supervised release to include home confinement and/or an extended term of supervision. § 3582(c)(1)(A). Non-custodial sentences such as home confinement and supervised release also "curtail prized liberty interests" and "the defendant always faces the harsh consequences that await if he violates the conditions" attached to such supervision. United States v. Gall, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005).

b) The BOP already designated Mr. Taylor as suitable for Home Confinement under the CARES Act once. It is unclear why they reversed their decision.

c) The record is rife with cases where the defendant was granted compassionate release to supervised release with an added term of home confinement, by this Court and others across the country. For example:

i) <u>United States v. Robinson</u>, 2020 U.S. Dist. LEXIS 160305 (W.D. Mo. 2020), (Drug offender who had completed only 28 of 132 months (21%) granted compassionate release to supervised release with the added condition of 6 months of home confinement with GPS monitoring);

ii) <u>United States v. Brownlee</u>, 2020 U.S. Dist. LEXIS 191915 (E.D. Mich. Oct. 16, 2020) (Bank robber with an "extensive criminal history," including multiple violent felonies and a history of the commission of new crimes while on prior supervision at least 6 times, granted compassionate release to supervised release with 18 months of home confinement added and 12 months of GPS monitoring added.);

iii) <u>United States v. Bandrow</u>, 2020 U.S. Dist. LEXIS 127031 (E.D. Mich. July 20, 2020) (Sex offender who had served only 18 months of a 60 month sentence (which was already a 150 month downward departure from his lowest Guideline range) granted compassionate release to supervised release with an added term of home confinement); etc.

## IV. §3553(a) FACTORS WEIGH IN FAVOR OF RELEASING MR. TAYLOR

1. Mr. Taylor acknowledges the seriousness of his crime and reflects upon it daily with a combination of remorse and a desire to make amends. He fully understands that pleading guilty in a timely manner was only the first step in taking accountability for his conduct and the harm it caused.

2. Since his sentencing, Mr. Taylor has dedicated himself to improving and rehabilitating himself. He has completed more than 23 rehabilitation programs with a focus on obtaining easily employable job skills and maintaining his sobriety. ATTACHMENT 8. He recently was awarded a Pell Grant and began college courses offered at FCI-Milan through local Jackson College to work towards an Associate's Degree in Bisiness. He has worked fulltime at the prison's furniture manufacturing plant for almost 8 years and "regularly receives Outstanding work evaluations." His BOP Case Manager writes, "He is respectful to staff and inmates and is not considered a management problem." ATTACHMENT 8. He was hand selected by prison staff to live in the Honors Unit (H-Unit). He's only had a single disciplinary infraction for missing an assignment (non-violent) that was over 10 years ago, and a spotless disciplinary record since that time. He has paid off all of his court-ordered monetary obligations.

3. Mr. Taylor's time-served is sufficient for the purposes of sentencing. Mr. Taylor has completed 81% of his statutory sentence. That does not count the 12 months off his sentence he will be awarded from completing the intensive Residential Drug and Alcohol Program (RDAP) in 2002, which brings him to 86% of his sentence completed. Counting that year off, Mr. Taylor only has 28 months remaining on his sentence, and only 16 months before he is sent to halfway house. This is a far higher amount of sentence completed than the vast majority of inmates granted compassionate release. See e.g., this Court in <u>Robinson</u> granted compassionate release after the prisoner only completed 21% of his

sentence. Supra. Also, recall the previous citation for Bandrow where the prisoner was released after completing only 30% of his sentence, and the Court found:

> He has already suffered meaningful and substantial punishment for his crimes. Moreover, [Defendant] will suffer additional restrictions on his liberty through the home confinement condition that the Court will impose. [Defendant]'s time served plus the continued restrictions on his freedom of movement from the home confinement condition imposed by the Court, together, satisfy the goal of imposing sufficient punishment.
> [...]
> Further, he has served a not insubstantial sentence in prison, and the lengthy period of custody is also long enough to achieve deterrence.

In contrast, Mr. Taylor has served over 165 months (13.75 years) in prison.

4. Mr. Taylor was already approved by the BOP for home confinement pursuant to the CARES Act, however, the BOP reversed their decision, supposedly because there were no active COVID cases at FCI-Milan at the time. Now there are over 100 active cases on the compound.[15] More importantly, the BOP determined that Mr. Taylor was no longer a danger to the community and that home confinement was an appropriate placement for him. Now he is asking this Court to release him to supervised release with home confinement as a condition of that release, under §3582, rather than home confinement under the CARES Act (which the courts have no authority to grant).

5. Releasing Mr. Taylor does not diminish deterrence or respect for the law. The logic leading to this conclusion was nicely stated by another Court in United States v. McConico, 2020 U.S. Dist. LEXIS 135718 (E.D. Mich. July 31, 2020):

> A reduction in [Defendant]'s sentence will not diminish the general deterrent value of [Defendant]'s original ten-year sentence. Individuals contemplating criminal behavior could hardly be expected to rely on an unforeseen event on par with a pandemic to reduce the prison sentences they would risk by their actions. Nor does a reduced sentence threaten to diminish respect for the law. Respect for the law is promoted by

<pre>          demonstrating its humanity as much as its rigidity.
          (emphasis added).
</pre>

6. Certainly, the severity of Mr. Taylor's conduct remains unchanged, and he acknowledges that his crimes qualified him for a considerable sentence. However, the overriding factor under §3553(a) that was not present at the time of sentencing is the COVID-19 pandemic. When this Court sentenced Mr. Taylor, it did not intend for that sentence to "include incurring a great and unforeseen risk of severe illness and death" brought on by a global pandemic. <u>United States v. Rodriguez</u>, 2020 U.S. Dist. LEXIS 58718 at 12 (E.D. Penn. Apr. 1, 2020). See also, <u>Tyler v. United States</u>, 2020 U.S. Dist. LEXIS 171702 at 9 (E.D. Va. Sept. 18, 2020) ("Although Petitioner's original sentence was lawfully imposed in accordance with the § 3553(a) factors, serious illness and the potential for accelerated death was decidely not among the reasons for it.").

## CONCLUSION

Ultimately, compassionate release will not undermine the goals of Mr. Taylor's original sentence. "The First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." <u>United Sates v. Brooker / Zullo</u>, 2020 U.S. App. LEXIS 30605 (2d Cir. Sept. 25, 2020). Mr. Taylor has demonstrated a number of factors that favor his compassionate release from prison, including, (1) his particularized risk of severe complications and death from COVID-19, (2) his particularized risk of contracting COVID-19 in the BOP and specifically at FCI-Milan, (3) his BOP-determined lack of dangerousness, (4) his rehabilitation efforts, and (5) the fact that he has sufficiently fulfilled the purposes of his original sentencing. The totality of Mr. taylor's circumstances constitute extraordinary and compelling reasons warranting compassionate release.

Moreover, courts have noted that while § 1B1.13 of U.S.S.G. provides "helpful guidance" for determining what constitutes extraordinary and compelling reasons

to warrant sentence reduction, the inquiry does not end there. Rather, the district courts now have the freedom to shape the contours of what constitutes 'extraordinary and compelling reasons.' See, <u>United States v. Jones</u>, 2020 WL 6817488, (6th Cir. Nov. 20, 2020) ("In cases where incarcerated persons file motions for compassionate release, federal judges ... have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13.").

## RELEASE PLAN

Upon release, Mr. Taylor plans to live with his father, Don Taylor, at 31 Dunedin Drive, Bella Vista, AR. 72715, where he will be able to socially distance, self-quarantine, properly perform santitation, and implement all other CDC recommendations that have not been possible in prison (or not followed by the BOP). In order to support himself, he plans to get a part-time job with the skills that he has learned while working in the prison factory, and continue his college studies to complete his degree and open up further opportunities for his future. He will also continue to maintain his sobriety and recovery through Alcoholics Anonymous and any counseling recommended by the Court or Probation Department. He pledges to never return to crime. ATTACHMENT 9.

WHEREFORE, David Taylor, pro se Petitioner/Defendant, based upon the above, respectfully requests that this Honorable Court GRANT this motion and ORDER that he be IMMEDIATELY RELEASED to supervised release at his father's residence.

DATE: 1/2/2021

Respectfully Submitted,

David Taylor 13682-045

David Taylor, pro se
Reg No. 13682-045
FCI Milan
P.O. Box 1000
Milan, MI. 48160