UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,
    Plaintiff,

v

DAVID TAYLOR,
    Defendant

Case 4:07-cr-00105-GAF

---

REPLY TO GOVERNMENT'S RESPONSE TO MY MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 USC 3582 (c)(1)(A)(i)

---

I am David Taylor, defendant, and I am filing this brief pro se.

    The First Step Act created the opportunity for inmates to request compassionate release directly from the courts, under 18 USC 3582(c)(1)(A), after requesting compassionate release from the warden of their institution and waiting 30 days.

18 USC 3582(c)(1)(A)
    "The court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of defendant's facility, whichever is earlier; may reduce the term of imprisonment ..."

    On September 13, 2021, I sent a request to the Warden Hemmingway at FCI Milan requesting compassionate release, as documented in my initial motion. (Doc No. 63) It has been more than 30 days since receipt by the warden. I have fully satisfied the exhaustion requirement of the statute.

    The government cites United States v. Hamilton (Doc 65, p5) which deals with retroactive amendments applied to sentences via 3582(c)(2) which is irrelevant to my motion. The government also quotes BOP Policy Statement 5050.50 which contains guidelines for the Director of the BOP to use, and represents the BOP interpretation of statutes specifically related to reduction in sentence when requested by the Director of the BOP. As the Director of the BOP did not request my compassionate release, the BOP Policy is also irrelevant to my motion.

    The Compassionate release statute directs the court to make three considerations, but the Seventh Circuit provided further instruction and clarification regarding proper analysis when evaluating a motion for a discretionary sentence reduction under 18 USC 3582(c)(1)(A) based on extraordinary and compelling reasons.

    "At step one, the prisoner must identify an 'extraordinary and compelling' reason warranting sentence reduction. Upon finding that the prisoner has supplied such a reason, the second step of the analysis requires the district court, in exercising the discretion conferred by the compassionate release statute, to consider any applicable sentencing factors in

3553(a) as part of determining what sentencing reduction to award the prisoner." Id. The Seventh Circuit has also held that "because the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of 3582(c)(1)(A) does not curtail a district judge's discretion. United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020). This Court is therefore not bound by the Sentencing Commission's analysis in 1B1.13 or the application notes regarding definition of 'extraordinary and compelling reasons.' Id. at 1181." United States v. Thacker, 4 F.4th 569, 576 (7th Cir. 2021)

    . The courts are not "divided on the applicability of USSG 1B1.13 when a motion for compassionate release is brought directly by an inmate under the First Step Act." (Doc 65, p4) In fact, all circuits except the 8th have reached a conclusion about 1B1.13 when an inmate files for sentence reduction under 3582. (Exhibit 1) In the 11th, the only Circuit to reach a different conclusion than all the other decided Circuits, the Dissenting Opinion in the case offers strong words. United States v. Bryant, No 966 F.3d 1243; 2021 U.S. App. LEXIS 13663, (11th, May 7, 2021) ("I have not found even a dissenting or concurring opinion among any of the circuit opinions deciding this issue that advocates for what the majority does here. As I understand it, that means my two colleagues in the majority are the only federal appellate court judges in the country to interpret the policy statement in the way they do here."

    . In an earlier case, the court noted "And although the Eleventh Circuit has not addressed this issue, seven courts of appeals agree with [this] Court's conclusion." United States v. Rahim, No 4:03-cr-45-MLB, (N.D. Ga., Apr. 15, 2021) (where the court evaluated the other circuit cases and agreed with them rather than disregard all of them and follow a minority of courts as the government urged. The Footnotes provide information about a multitude of cases the court consulted.)

.    The government's response bases their entire objection to my motion intent on applying 1B1.13 of the Sentencing Guidelines.  On page 4, they reference 1B1.13 and on page 5 they point out it is "at the very least instructive" but then on page 6 they claim "The Sentencing Commission's pertinent policy statement related to extraordinary or compelling reasons appears at U.S.S.G. 1B1.13"

.    As noted in the 7th, and the other cases listed in Exhibit 1, 1B1 is instructive but cannot be binding.   The government uses 1B1.13 on page 6, page 7, 8,10, 11, 14, and 15.  The government claims I am a danger to the community because of what happened and quotes the requirement of 1B1.13, which almost all circuits agree is only instructive.  The Seventh specifically says that danger to the community is not relevant in prisoner filed compassionate release, which is why they have provided a two step process for evaluation of prisoner filed compassionate release motions. Id.  Then the government proceeds to repeat my history from 17 years ago and then proceeds back to when I was 21.

.    I am not the same person I was in 2007 and certainly not the same person I was at 21 years of age.

.    For these reasons, I request the court take note of their repeated dependence on dated information and the informative but not binding 1B1.13 to recognize their lack of any definitive source of a foundation for their argument against my motion.

.    I have been incarcerated at FCI Milan, in Milan Michigan, since 2010.

.    FCI Milan had a significant outbreak of COVID-19 in 2020 and at least 3 inmates died.  They had a second significant outbreak in December 2020.    The Department of Justice Office of the Inspector General (DOJ-OIG) investigated FCI Milan in January 2021 due to the administrative and management failures that led to the very serious outbreaks and deaths.  Although written as an investigation of COVID, the DOJ-OIG report is informative about conditions and operations at FCI Milan.

.    "The situation at FCI Milan is serious enough that the Department of Justice Office of the Inspector General investigated the facility in January of this year." United States v. Davis, 2021 U.S. Dist. LEXIS 110636, No. 15-cr-20152 (E.D. Mich. Jun. 2021) "Its report finds as ongoing concerns that the facility design makes social distancing difficult, that FCI Milan still does not test staff for COVID-19, and that there is a need for increased cleaning and hand sanitizer supplies.  See Pandemic Response Report 21-032 at 8,14, 15, https://perma.cc/3T3K-7NJQ.  The report also highlights several administrative and management failures that exacerbated FCI Milan's COVID-19 outbreaks."

.    The report explains that the Unicor Factory at Milan and the H housing unit, which houses many Unicor workers had the highest number of inmates test positive. Id P8.

.    I work at Unicor and am housed in H Unit, but there are Unicor workers living in every housing unit.  Unicor has over 225 workers in the plant.  Working close together in the factory with no social distancing, and no masks provides for easy

spread of any infectious illness across all housing units quickly. As the CDC has regularly stated and CNN frequently broadcast, both vaccinated and unvaccinated individuals can carry the virus.

. On November 24th, NBC Nightly News reported that infection rates were rising across the country and Michigan's was up 68% over the prior period and has now exceed their highest number of infections since the pandemic began. On November 26th, CNN reported that the Federal Government was sending medical teams to Michigan to assist with the significant increase in COVID-19 cases and hospitalizations.

. CNN has reported a new variant, Omicron, that is spreading and is dramatically different from any prior variant. The new mutation, which is potentially more transmissible was first discovered in South Africa. The World Health Organization (WHO) said early evidence indicates it could pose an increased risk for reinfection and said some of the mutations detected in the variant were concerning. More research is underway. https://www.cnn.com/2021/11/27/world/omicron-coronavirus-variant-intl/index.html

. On November 26, the World Health Organization (WHO) classified a new variant, B.1.1.529, as a Variant of Concern and named it Omicron.

. As COVID-19 cases are rising dramatically outside, FCI Milan is returning to normal operations. A recent announcement about laundry procedures says "current COVID operations allow inmates to pick up their laundry as they did pre-COVID". (exhibit 2) The new COVID operations require no restrictions and no need for social distancing.

. The Chow Hall has reopened for every meal and we eat sitting shoulder to shoulder. Some of the staff in the chow hall wear masks, and all inmates are required to wear masks while standing in line to get a food tray.

. The staff in Education and Medical typically wear masks, but very few other staff do. Inmates are told to wear masks while walking between buildings by staff who are usually not wearing them, although there are a few staff members who are much more consistent with their own mask and with making inmates wear theirs. We do what the staff tells us to.

. We stand, in crowds of 200 or more to drop off our laundry and again to pick it up. We do that two or three times per week. We stand in crowds to get into Unicor, out of Unicor for lunch and out of the factory at the end of the day.

. Recreation has reopened, releasing multiple housing units together for the gym, fitness equipment and crafts.

. Education resumed "in person" classes again in September and the next group of classes begins in January. At least one instructor missed several weeks of classes in October/November as he and his wife had COVID.

. The BOP Medical care, which includes dental, is not what is recognized outside as "health care". This is "symptom response." If I complain about a specific ailment or issue, Health Services will either do something about it or tell me to purchase an over the counter (OTC) pain reliever from the commissary and "report back to sick call if it changes."

. An inmate at the BOP facility in Terre Haute, Indiana experienced that response. Gilmore v Decker, No: 2:16-cv-00209, March 3,2020 (Where the court found "a complete lack of continuity of care. BOP Medical Staff only treated [defendant's] symptoms in isolation without any reference to [defendant's] medical history or even his very recent history of continued complaints." The only treatment he received was a three day prescription of tylenol.

. The court further found "Health Services decided they were done seeing [defendant] for the complaints and [defendant] suffered extreme pain caused by a life threatening medical condition in his cell without any medical attention or treatment for eleven days."

. For five years, an inmate attempted to get Health Services to remove a bullet that was under his skin and causing increasing issues and pain. He tried at FCI Milan, Terre Haute and Ft. Worth. (Powell v. United States, No: 4:16-cv-1130-A) (Where court found health services decisions are never based on a valid reason, but instead are based on convenience to staff and cost to the BOP. After 5 years trying to get the bullet removed, [defendant] cut open his own shoulder and removed it himself. "Care is better outside of prison.")

. I had a tooth extracted in December of 2020, another in January 2021, and a third in February of 2021. I had not been seen for a cleaning or exam for over five years, in spite of numerous requests I made.

. Having one tooth extracted each month for three successive months is not dental care. It is symptom response. Dental care is regular cleanings, preventing teeth from deteriorating to the point where they need extraction. I've lost 11 teeth in the 14 years I've been in BOP custody. I'm told that I qualify for dentures, but there is over a three year waiting list.

. Waiting three to five years for a cleaning means no dental issues are dealt with unless they are deemed to be emergencies.

. Although the numbers are not published anywhere I can see them, I've always been told "I'll put you on the list." as a solution to my dental complaints. Milan has had no dentist since October 2021, so the waiting lists here, for over 1,400 inmates continues to grow.

. Apparently there are two lists for dental care within the BOP. One list is for routine care and the other is for emergency care. (Daly v. Wiley, No: 08-cv-00411) (Where defendant had a filling fall out and by the time the dentist saw him two years later, a second filling had fallen out. Defendant had not had a cleaning in years.

. The waiting list for routine care, such as cleanings and fillings "can be lengthy and may exceed three years." (Stang v. United States, No: 3:15-cv-002318) (Where court heard testimony that routine care had "about four years of wait time." When fillings are required on an emergency basis, the dentist will provide a temporary filling and the inmate will be added to the routine care waiting list to get it replaced with a permanent filling. Id. Temporary fillings are not intended to be in place for three to five years.

(Exhibit 3)

When dental pain exists along with a non life threatening dental issue, Health Services will treat the pain separately so that the inmate can be added to the routine dental care list and then wait years for care. (Powell v. United States, No: 4:16-cv-1130-A)(Where defendant was evaluated and diagnosed through a 5"x25" cell window, prescribed medication by a physician that had never seen him for an infection that wasn't visible or identified, and was then added to the dental waiting list.)

The First Step Act, Pub. L. No. 115-05, 132 Stat. 15 (2018), signed into law on December 21,2018, provides comprehensive federal criminal justice reform.

One of the provisions of the First Step Act is that eligible inmates would be able to earn First Step Act Time Credits for participation in Evidence-Based Recidivism Reduction Programs and Productive Activities. The First Step Act Time Credits earned by inmates would be applied towards prerelease custody and supervised release, reducing an inmate's time in prison. 18 USC 3635 (4)(C)

Eligibility for the First Step Act Time Credits (FSA Time Credits) is detailed in 18 USC 3632 (d)(4)(D) and contains over five pages of criminal violations that preclude an inmate from earning the FSA Time Credits. Review of the exclusion list confirms that I am eligible to earn FSA Time Credits.

Under the First Step Act, the Attorney General was required to create a risk and needs assessment system called "Prisoner Assessment Tool Targeting Estimated Risk and Needs" (PATTERN) as specified in 18 USC 3632(a), and to "determine the type and amount of evidence based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner such programming accordingly" 18 USC 3632 (a)(3).

The Attorney General was required to develop the needs assessment system, PATTERN, within 210 days of the law's enactment on December 18, 2018. 18 USC 3632 (a). Due date: July 19, 2019.

In defining the BOP start date, 18 USC 3621(h)(1) clearly specifies the date as 180 days after the PATTERN due date, for a due date of January 15, 2020 and then follows up with the implementation requirements. "Not later than 180 days after the Attorney General completes and releases the risk and needs assessment system [PATTERN] ... the Director of the Bureau of Prisons shall":

3621(h)(1)(A) - "implement and complete the initial intake risk and needs assessment for each prisoner ... and begin to assign prisoners to appropriate evidence-based recidivism reduction programs based on that determination;"

3621(h)(1)(B) - "begin to expand the effective evidence-based recidivism reduction programs and productive activities it offers and add new" programs and activities.

3621(h)(1)(C) - "begin to implement the other risk and needs assessment tools necessary to implement the system over time, while prisoners are participating in and completing the evidence-based recidivism reduction programs and productive activities."

The way I earn FSA Time Credits for participating in the programs and activities is in 18 USC 3632 (d)(4), including:

(i) a prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

(ii) a prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

It also specifies that Time Credits are not optional. The word "shall" is significant.

. 18 USC 3621(h)(3) addresses the two year phase in of the program, beginning on the due date of the completed PATTERN assessment: January 15, 2020. "Priority during phase-in. -- During the 2 year period described in paragraph (2)(A), the priority for such programs and activities shall be accorded based on a prisoner's proximity to release date." By making it a priority to provide programs to prisoners based on proximity to release date, the statute makes it clear that prisoners who earn sufficient time credits during the phase in period could be released prior to the end date of the two year phase in period.

. 18 USC 3621 (h)(4) provides the BOP with the option for "preliminary expansion of evidence-based recidivism reduction programs and authority to use incentives" even before PATTERN is completed. This section, clearly distinguished from other parts of the act, contains "may" rather than "shall" but contains authorization to use the programs and incentives prior to PATTERN completion, which was July 19, 2019.

. "Beginning on the date of enactment of this subsection,", which is December 21, 2018, "the Bureau of Prisons may begin to expand any evidence-based recidivism reduction programs and productive activities that exist at a prison as of such date, and may offer to prisoners who successfully participate in such programs and activities the incentives and awards described in subchapter D." This is an optional provision for the Bureau of Prisons and not to be confused with the requirements mandated in 18 USC 3621(h)(1)(A)-(C)

. When considering statutory construction "words generally should be 'interpreted as taking their ordinary, contemporary, common meaning ... at the time Congress enacted the statute.' " Wisconsin Cent. Ltd. v. United States, 1338 S. Ct. 2067, 2074 (2018) (quoting Perrin v. U.S., 444 U.S. 37, 42 (1979)). Courts must also bear in mind the "fundamental canon of statutory construction that words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Util. Air Regulatory Grp. v. E.P.A., 573 U.S. 302, 3199-20(2014)(quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 1333 (2000)). "When the words of a statute are unambiguous ... judicial inquiry is complete." Connecticut Nat. Bank v. Germain, 503 U.S. 249, 257 (1992). Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always 'give effect to the unambiguously expressed intent of Congress.'" Util. Air Regulatory Grp., 573 U.S. at 326(quoting National Assn. of Home Builders v. Defenders of Wildlife, 551 U.S. 6444, 665 (2007) (quoting Chevron, U.S.A, Inc. v. Natural Resources Defense Council, Inc., 467, U.S. 837, 843 (1984)).

. To determine whether the BOP is required to apply my FSA Time Credits before the January 15, 2022 completion date for the phase-in, the "statute must be read in [its] context and with a view to [its] place in the overall statutory scheme." Util. Air Regulatory Grp., 573 U.S. at 320 (quoting FDA v. Brown & Williamson Tobacco Corp., 5299 U.S. 120, 133 (2000)).

In this regard, Section 3621 (h) requires "Not later than 180 days after the Attorney General" releases PATTERN, "the Director of the Bureau of Prisons shall" ... and then 3621(h)(1)(A) continues "begin to implement ... tools necessary to effectively implement the System over time, while prisoners are participating in and completing the effective evidence based recidivism reduction programs and productive activities." As the plain language states, this statutory provision anticipates that some prisoners will complete the programs within the phase-in period.

. While the statute does not explicitly provide a date when the BOP must apply my earned credits from participation in recidivism reduction programs and productive activities, it does specify that priority will be given to prisoners based on proximity to release date and that some prisoners will complete the program during the 2-year phase in. Awarding FSA Time Credits is not optional, for eligible prisoners.

. The statute is very clear about when I start earning First Step Act Time Credits: "prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed ... prior to the date of enactment of this subchapter." 18 USC 3632(d)(4)(B).

. There is no statutory framework for delaying application of incentives I earn during the phase-in program until January 15, 2022, the final date when the BOP must complete the phase-in with respect to "all prisoners". See 3621 (h)(2)(A). Even "all prisoners" indicates that all prisoners must be afforded the PATTERN program but does not exclude that some of the eligible prisoners will participate in, earn incentives and complete the program before the end of the phase-in period.

. Such is supported by the following DOJ statement. On January 15, 2020, the Department of Justice released a statement regarding its performance under the First Step Act:

. "Beginning today, inmates will have even greater incentive to participate in evidence-based programs that
. prepare them for productive lives after incarceration ... As of Jan 15, 2020, inmates will be assigned to
. participate in [Programs] based on an initial needs assessment."

.   The government raised no issue with the First Step Act Time Credits, obviously aware of the statutes seeing no need to contest their applicability.

.   The BOP calculates my release date, including the Good Conduct Time I've earned, to be March 12, 2024. This does not include any First Step Act Time Credits.

.   According to the First Step Act, I began earning time credits on December 21, 2018, when the statute was signed into law. 18 USC 3632(d)(4)(B)

.   I have been working at Unicor (Federal Prison Industries), identified as an evidence based recidivism reduction program eligible for First Step Act Time Credits in 18 USC 3635(3)(C)(xi), it qualifies for First Step Act Time Credits beginning on December 21, 2018. From December 21, 2018 to December 31, 2021, I earned 36 months and 10 days of evidence based recidivism reduction program time working at Unicor which earns FSA Time Credits at a rate of 10 days for each 30 days of participation and an additional 5 days per 30 days for a total of 18 months and 5 days. March 12, 2024 less 18 months and 5 days is September 7, 2022.

.   I have been attending Jackson College since January 15, 2019, which is identified as eligible for First Step Act Time Credits under 18 USC 3635(c)(C)(iv). From January 15, 2019 to December 31, 2021, I earned 35 months and 15 days of evidence based recidivism reduction program time attending classes at Jackson College, which earns FSA Time Credits at a rate of 10 days for each 30 days of participation and an additional 5 days per 30 days for a total of 17 months and 22 days. September 7, 2022 less 17 months and 22 days is March 15, 2021.

.   With the First Step Act Time Credits I've earned, my sentence is complete. This is extraordinary and compelling.

.   As I look around here, I see two distinct attitudes. Many are angry and rebellious, resenting having been caught and certain that they will not get caught next time. Others realize they need to become a different and better person.

.   I chose the latter.

.   I am not the same person that was indicted in March 2007, almost fifteen years ago.

.   Rehabilitation is not served on a platter here. It takes work and determination. It is much easier to watch TV, play cards, and hang out with the rebellious crowd.

.   Many programs are not even available to inmates until we are within 3 to 5 years of release. It is frustrating to be told you don't qualify for a program because you have too much time left.

.   At FCI Milan, I've been working full time at metal office furniture factory of Unicor, over 36 hours per week, for almost 10 years. I've learned to use SAP Software to manage our plant. We have about 250 inmates working in the factory making large and small file cabinets, bookcases, wardrobes and other furniture for government agency use.

.   I've learned accounting and functioned as the accounting clerk. I learned to be a Quality Control Technician, inspecting

parts while comparing measurements to the blueprints, and earned an industry standard quality certification as demonstrated in my initial motion. I then worked for a time as the administrative clerk for the Quality Control Department.

. I am now a capable and qualified candidate for a position with a midsize to large company. My certification and SAP experience are both an added plus for such a position.

. In fourteen years, I've had one disciplinary report. It was in 2010 and both the Education Department and the Unit Team Case Manager had scheduled me for a "call out" to meet them at the same time, on the same day. I went to see the Case Manager and was later written up by the Education Department for failing to show up as scheduled.

. I am over half finished earning a college degree, which is why I am still at FCI Milan instead of being transferred to a BOP Camp. Last term, one of my classes was Statistics and Probability which I passed with a 95%. I am on the Dean's List for maintaining high grades with a full course load.

. I now have the knowledge, skill, and experience to get a good job and be a contributing member of my community. I have worked very hard to learn usable skills in preparation for release.

. The result of my determination to rehabilitate myself has been significant, and it is of significance to the court as rehabilitation is specifically mentioned as a contributing criteria for compassionate release. United States v. Brown, No 4:05-cr-00227-1 (S.D IA, April 29, 2020) (Where court found "Rehabilitation of defendant alone shall not be considered sufficiently extraordinary and compelling to to justify compassionate release. 28 USC 941(t) For the word alone to do any work, as it must, that means courts can consider rehabilitation as part of a compassionate release motion. A statute should be constructed so that effect is given to all its provisions."

. Poor dental has created significant risks to both my current and future health. The sooner I am able to obtain "outside" dental care, the sooner I can begin an effort to save my remaining teeth or take whatever appropriate action a dental care professional recommends as a result of my years to sub standard care. My health has suffered and continues to suffer in BOP custody, and the problem is systemic, not unique. My health needs are not being addressed and I am at risk.

. The sentencing factors of 3553(a) support my release as my sentence is complete and nothing in 3553(a) suggests that an inmate should be kept longer than the sentence requires.

. Release according to new laws such as the First Step Act create respect for the law. United States v. Reed, 2021 U.S. Dist. LEXIS 55746, No. 3:006-cr-75, (N.D. Ind. Mar 2021) (Where the Court noted "An early release would be inconsistent with the goals of consistent sentencing among similar offenders, but an early release might foster respect for the law, which includes Congress's grant of authority to release offenders for extraordinary and compelling reasons."

.    I have a specific re-entry plan: I will live with my dad, and subject to the conditions of the Court, I will look for employment and do what I can to help out around the house. I will adhere to all court requirements and I will have the emotional support of my dad.

.    My conduct has been excellent. With the exception of the one incident report that I received in 2010.   With FSA time credits my sentence is complete.

.    I request the Court reduce my sentence to time served rather than make any attempt to request the BOP apply my time credits, or alternately other, further or different relief as may be appropriate, whether or not I specifically requested it.

Respectfully submitted,

David Taylor    13682-045                              Date Signed and mailed

Prison Mailbox Rule
On the above date I signed this document and placed it into the outbound mail receptacle at FCI Milan with sufficient first class postage and addressed to the clerk of the court for filing. Pursuant to the Prison Mailbox Rule, this brief is considered filed as of this date.

The prison mailbox rule was first applied to notices of appeal, see Houston, 487 U.S, at 276, the rule applies to all district court filings save for "exceptional situation[s]" Edwards v. Unite States, 266 F.3d 756,756  (7th Cir 2001).

Mailing address:
David Taylor 13682-045
FCI Milan
PO Box 1000
Milan, MI  48160

*See United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021); *United States v. Brooker*, 976 F.3d 228, 234-37 (2d. Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 281-84 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021); *United States v. Jones*, 980 F.3d 1098, 1109-11 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1181 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1262 (11th Cir. 2021) (holding that section "**1B1.13** is still an applicable policy statement for a Section 3582(c)(1)(A) motion, no matter who files it.").

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 1



**U.S. Department of Justice**
**Federal Bureau of Prisons**
Federal Correctional Institution
Milan, Michigan 48160

November 3, 2021

MEMORANDUM FOR    INMATE POPULATION

FROM:                M. Reed, Trust Fund Supervisor

SUBJECT:             Unicor Laundry procedures revised

Beginning November 8, 2021, Unicor inmates will drop off their laundry on the outer unit scheduled laundry days. Due to the fact that current COVID operations allow inmates to pick up their laundry as they did pre-COVID, Unicor work details will drop off their laundry during the breakfast meal and pick up their laundry during the noon meal. As always only one bag per inmate will be permitted.

Per policy 4500.12, Procedures for Exchange and Cleaning of Linen/Clothing, all inmates are issued at least three changes of clothing, and reasonable cleaning schedule is provided by offering all units the opportunity to drop off laundry twice a week.

*Exhibit 2*

BOP policy allows only provisional restorations (temporary fillings){2018 U.S. Dist. LEXIS 7} to be placed during **dental** sick call. Kelsch Decl. ¶ 12, ECF #49; *see also* ECF #47-3, at 12 (**BOP** Program Statement P6400.02(8)(d)(1) (stating that "placement of a definitive restoration should only be considered when a temporary restoration cannot be placed" during **dental** sick call "as the placement of permanent restorations requires a treatment plan")). Accordingly, Dr. Kelsch placed a temporary filling in tooth #31, and advised Stang that a permanent filling would be placed when his name reached the top of the NRC Waitlist. Dr. Kelsch told Stang that "his sensitivity issues may persist due to his heavy bruxism." Kelsch Decl. ¶ 12, ECF #49. Dr. Kelsch advised Stang to deal with **dental** sensitivity by using sensitivity toothpaste, brushing and flossing regularly, avoiding cold foods, and eating slowly to avoid cold food items contacting the surface of his teeth.3 *Id.* ¶ 13; Stang Decl. ¶ 3, ECF #58.

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Clerk of the Court
United States District Court

United States v. David Taylor
Case 4:07-cr-00105-GAF

I apologize for the appearance of the attached brief. I have no word processing and must use either the text based email system or a typewriter for documents. This is an email that I manually format and print. I then cut off the top of each page and photocopy the set to return it to 8 1/2 x 11 inch size.

I manually double space the document by inserting blank lines.

.    I cannot indent, without inserting a . (dot) at the beginning of the line.

Multiple blank lines are removed when I save a document, unless there is a . (dot) at the beginning of the line.

This is the best I can do with the limited tools provided at FCI Milan.

_David Taylor_          13682-045
David Taylor

Mail
David Taylor 13682-045
FCI Milan
PO Box 1000
Milan, MI 48160